## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

BRIAN NIEMIEC,

      Plaintiff,

        v.

CLUB SPORTS CONSULTING GROUP,
INC.,

      Defendant.

No. 13 C 6278
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

      Plaintiff Brian Niemiec brings this action against Defendant Club Sports Consulting Group ("CSCG") alleging retaliatory discharge related to an EEOC filing under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a), and retaliatory discharge related to a workers' compensation claim under state law.

      This case is currently before me on Defendant's motion for summary judgment. For the following reasons, I grant the motion for summary judgment on the Title VII claim and *sua sponte* dismiss the state law claim without prejudice.

## BACKGROUND

      The present suit arose out of a work-related injury and an unrelated EEOC complaint. Plaintiff Brian Niemiec has alleged that Defendant CSCG terminated his employment in retaliation for filing a workers' compensation claim and for submitting a complaint to the EEOC. Workers' compensation retaliation is actionable in Illinois under *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172 (1978). Retaliation related to EEOC complaints is a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a).

1

## I. The Parties

Plaintiff Brian Niemiec worked as an ice rink operations manager for Defendant Club Sports Consulting Group, Inc. ("CSCG") until he was fired on April 23, 2009. His duties included maintenance of the ice rinks' mechanical systems, among other things. Defendant CSCG is an Illinois corporation which provides management services for ice arenas, including the Leafs Ice Centre in Dundee, Illinois and the North Shore Ice Arena in Northbrook, Illinois. Don LaPato is the president and owner of CSCG.

The relationship between Defendant and two non-parties is important in this case, so a word about them is necessary. Leafs Ice Centre is owned by LHC, LLC, an Illinois company whose sole member is Leafs Hockey Club, Inc. For clarity, LHC, LLC will be referred to as "LHC" and Leafs Hockey Club, Inc. will be referred to by its full name. The two are separate entities. The contract for management of Leafs Ice Centre was between LHC, LLC and CSCG, the defendant. Although LHC, LLC is wholly owned by Leafs Hockey Club, Inc., they have separate boards of directors. Some directors hold positions on both boards. Mike Durkin is the president of LHC, LLC.

## II. Plaintiff's Work Injury

Plaintiff's employment difficulties began, for the purposes of this suit, on January 24, 2009, when he injured his ankle while working at North Shore Ice Arena. The injury was significant enough that Plaintiff sought treatment at a hospital on January 25, and was unable to report to work. The hospital visit was processed as a workers' compensation claim. Plaintiff's doctor recommended that he perform only seated work through at least March 3, 2009. When Plaintiff reported this work restriction to CSCG, he was told that he was not allowed to return to work until he was medically cleared without restrictions.

Prior to his injury, Plaintiff had been receiving a $200 monthly health insurance reimbursement as part of his paycheck from CSCG. However, CSCG stopped paying the health insurance reimbursement after Plaintiff reported his ankle injury through workers' compensation. Plaintiff claims that Don LaPato "yelled" at him for reporting his ankle injury as work-related. At some point, a dispute arose between Plaintiff and Defendant over payment of medical bills which were to be covered by Plaintiff's workers' compensation benefits. The dispute was heard by an arbitrator for the Illinois Workers' Compensation Commission on March 24, 2009, and resulted in CSCG being ordered to pay Plaintiff's injury-related medical expenses.

### III. Plaintiff's Equal Opportunity Claims

Meanwhile, Plaintiff claims his treatment at work had been problematic for some time. In May 2008, some months before the ankle injury, Plaintiff had complained to CSCG's human resources firm about sexually lewd and harassing statements by another CSCG employee. Plaintiff claims that LaPato reprimanded him for making the report, threatened his job, and instructed him to warn every other employee that they were not allowed to contact human resources.

In early February 2009, very shortly after his injury, Plaintiff was asked to participate in an interview concerning an EEOC charge filed by another CSCG employee. Plaintiff claims that, prior to this interview, LaPato intimidated him into lying to the EEOC investigator by threatening to fire him if he refused. LaPato and a lawyer for CSCG were present with Plaintiff for the interview. The next day, Plaintiff telephoned the EEOC to correct his statements, and then went into the EEOC office to further discuss the situation. He filed his own EEOC complaint on February 12, 2009, alleging sexual harassment, sex discrimination, and discrimination after having engaged in a protected activity. No facts were included in the EEOC complaint to

elaborate on the claim.

LaPato received a copy of Plaintiff's EEOC charge no later than February 17, 2009. CSCG turned the charge over to an attorney to investigate. There was no more relevant activity for the following two months, during which Plaintiff remained on unpaid leave due to his injury. CSCG retained a contractor, DualTemp, to examine and perform maintenance on mechanical systems which had been Plaintiff's responsibility. DualTemp performed the required maintenance and issued reports describing what was done. The parties dispute the character of the reports, but their disagreement is largely irrelevant.

### IV. The Limited Offering Memorandum Incident

On the evening of April 13, 2009, while still on leave, Plaintiff went to Leafs Ice Centre ostensibly to pick up personal belongings. While there, he found LHC's "Limited Offering Memorandum" ("LOM"), a comprehensive document related to an issue of bonds by LHC. The document contained business plans, financial information, membership demographics regarding LHC, and other data. The parties dispute whether the LOM was sensitive and confidential.

The Leafs Hockey Club, Inc. board was meeting at Leafs Ice Centre that same evening. One of the board members was Gabe Fuentes, who by all accounts was very interested in the financial situation of LHC and in whether the money related to the bond issue was being spent wisely. Fuentes was a "thorn" in the sides of both Plaintiff and LaPato in relation to financial issues. Fuentes' efforts to learn more about LHC's spending also alienated him from LHC's president, Mike Durkin. The parties disagree as to whether Fuentes, as a Leafs Hockey Club, Inc. board member, was entitled or authorized to access the LOM, but it is undisputed that as of April 13 he had never seen the document.

As it turns out, Plaintiff delivered the LOM to Fuentes that night. Plaintiff then left the

4

building empty-handed, without any personal effects. The next day, April 14, Fuentes determined he did not have any right to look at the LOM and voluntarily returned it to LHC.

Although the confidentiality of the LOM is in dispute, CSCG's employee handbook says that all records relating to CSCG or its clients are confidential and must be treated accordingly. It specifies that purposeful or inadvertent disclosure to unauthorized people inside or outside the office must be avoided. Finally, it warns that CSCG may take disciplinary action, including dismissal, in the event of an employee's disclosure of confidential information, whether knowing or unknowing. Plaintiff signed for and agreed to read the employee handbook.

### V. Plaintiff's Firing

Durkin, president of LHC, was "extremely" upset that the LOM had been provided to Fuentes. After the LOM incident, Durkin verbally requested that LaPato take appropriate action against Plaintiff. Durkin also recommended terminating Plaintiff and barring him from Leafs Ice Centre. Durkin, in his capacity as president of LHC, sent a letter to LaPato dated April 22 reiterating his displeasure over Plaintiff's provision of the LOM to Fuentes and stating that Plaintiff's actions were a breach of CSCG's contract with LHC. LaPato felt the letter instructed him to take action against Plaintiff, and that it didn't afford him any "wiggle room." LaPato also believed, based on the letter from Durkin, that Plaintiff had to be terminated in order for CSCG to retain its contract with LHC. LaPato testified that he decided to fire Plaintiff based on the provision of the LOM to Fuentes.

Plaintiff was terminated on April 23, 2009. Thereafter, he filed a retaliation complaint with the EEOC and brought this suit.

# LEGAL STANDARD

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

I consider the record in the light most favorable to the non-moving party, and I draw all reasonable inferences in the non-movant's favor. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002). I will accept the non-moving party's version of any disputed fact, however, only if it is supported by relevant, admissible evidence. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

**DISCUSSION**

**I. Title VII Retaliation**

Plaintiff's first claim is that Defendant fired him "in retaliation for Niemiec reporting the truth to the EEOC in connection with a claim under Title VII asserted by an employee of CSCG." "Title VII forbids retaliating against an employee 'because he has opposed any practice made ... unlawful ... by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Collins v. Am. Red Cross*, 715 F.3d 994, 998 (7th Cir. 2013) (*quoting* 42 U.S.C. § 2000e–3(a)). Title VII retaliation claims may be proved under either the "direct method" or the "indirect method." *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012). Plaintiff appears to have chosen the "direct method." To survive summary judgment, Plaintiff "must submit evidence from which a jury could reasonably conclude that (1) he engaged in statutorily protected activity; (2) he suffered a material adverse action; and (3) a causal link between the two." *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014).

There can be no dispute that the first two elements are met. Plaintiff engaged in a statutorily protected activity when he filed an EEOC complaint on February 12, 2009. He also suffered a materially adverse employment action when he was fired on April 23, 2009. Thus, the only element in dispute is causation.

Title VII retaliation claims require that the Plaintiff show "but-for" causation.[1] *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013) (*citing University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2533 (2013)). Although Plaintiff is

---

[1] Plaintiff cites older 7th Circuit cases for the proposition that a lower causation standard is appropriate, but those cases are superseded by *Nassar*.

proceeding under the "direct method" of proving retaliation, both direct and circumstantial evidence may be used as proof. *See Ripberger v. Corizon, Inc.,* 773 F.3d 871, 881 (7th Cir. 2014). Circumstantial evidence can be used to construct a "convincing mosaic" of causation. *Hobgood*, 731 F.3d at 643-44. The mosaic may include suspicious timing, oral or written statements, evidence of pretext, and other evidence which supports an inference of retaliatory intent. *Id*.

Plaintiff has argued that several facts, taken together, indicate he was fired in retaliation for filing an EEOC complaint. First is that the firing occurred two months after Plaintiff's EEOC complaint, which Plaintiff claims creates suspicious timing. Second is that LaPato threatened Plaintiff with termination regarding Plaintiff's testimony to the EEOC in another employee's case. Third is that Defendant fabricated documents in its letter justifying Plaintiff's firing to the EEOC. Fourth is that the letter contained additional reasons for the firing, such as Plaintiff's frequent tardiness, but that Defendant now points only to the LOM incident as the reason for the termination. Plaintiff claims that this shift indicates that the proffered justification for the termination is merely pretext. Lastly, Plaintiff asserts he was a qualified ice rink operations manager at the time he was fired.

Plaintiff's facts, however, are not the only ones to be considered for causation. The facts alleged "must be put into context and considered as a whole." *Hobgood*, 731 F.3d at 644. Defendant has presented a powerful argument against causation—a legitimate business reason for firing Plaintiff. According to Defendant, the firing was ultimately caused by the LOM incident. In considering this explanation, which is reasonable on its face, I must also analyze whether the proffered justification is mere pretext to cover for a discriminatory firing.

Pretext analysis focuses on whether the proffered reason for firing is a lie. *Cung Hnin*, 751 F.3d at 506. The primary issue is the honesty and sincerity of the employer's explanation, not its validity or reasonableness. *Id.* "[T]he 'question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge.'" *Id.* (*quoting Coleman*, 667 F.3d at 852).

Most of Plaintiff's pretext argument focuses on showing that the LOM was not, in fact, confidential, and that Fuentes was not, in fact, unauthorized to have it. Plaintiff backs up his argument with deposition testimony from Durkin in which Durkin says that he now thinks Fuentes was entitled to view the LOM. Plaintiff also notes that the LOM has since been filed as part of the record in a federal case. These are valid arguments as they relate to the "good reason" and "common sense" of a business decision, both of which factor into how much I believe the employer's justification, if at all. *See Hobgood*, 731 F.3d at 646. A proffered business reason which is without factual basis or completely unreasonable is evidence that an employer might be lying. *Id.*

Even so, the material question is not whether Defendant was mistaken about the LOM's confidentiality or Fuentes' authorization, but whether Defendant reasonably and sincerely believed those things to be true. The facts offered by Plaintiff may indicate that Defendant was wrong about the confidentiality of the LOM or Fuentes' authorization to see it, or that the LOM is no longer confidential. But they do nothing to indicate that a sincere belief that the LOM was confidential in April of 2009 defied "good reason" or "common sense," as would be necessary to show pretext. To the contrary, the deposition testimony of both LaPato and Durkin indicates they

thought Plaintiff had violated confidentiality by disclosing the document.[2] The record indicates

that LaPato and Durkin were both incensed that Plaintiff disclosed the LOM, which they

considered to be a confidential document, to Fuentes, whom they considered to be an

unauthorized person. Further, CSCG's policies are consistent with the firing—the CSCG

employee handbook warns that all client information is confidential, and that disclosing it could

result in termination.

Defendant's contemporaneous actions are also consistent with their genuine belief that

the LOM incident was grounds for firing. The record indicates that Durkin verbally

recommended that LaPato fire Plaintiff. Durkin also sent a letter to LaPato a week after the LOM

incident requesting Plaintiff be barred from the facility and indicating that his actions were a

breach of CSCG's contract with LHC. Likewise, LaPato testified that he thought, based on

communications from Durkin, that he had little option other than to fire Plaintiff. For these

reasons, I find no indication that Defendant was not sincere in proffering the LOM incident as

his reason for firing Plaintiff.

Nor do the other reasons relied upon by Plaintiff sufficiently call into question the

validity of Defendant's motive for the firing. The timing between the EEOC complaint and the

firing is unremarkable. Defendant correctly notes that in some cases, two months has been found

to be too long as a matter of law to prove causation. Plaintiff correctly notes that timing is not

dispositive when other circumstantial evidence is present. *See Malin v. Hospira, Inc.*, 762 F.3d

552, 559 (7th Cir. 2014), *reh'g denied* (Sept. 16, 2014) (holding 3 years was not too long, in

_____

[2] Plaintiff has objected to some testimony of Durkin and LaPato as hearsay, but this is not so. To the extent that such testimony is used in this opinion, the statements are used to establish what various parties thought, not whether those thoughts are indicative of the truth of the matter. As already discussed, the fact of whether or not the LOM is confidential is largely irrelevant to pretext analysis.

combination with other factors). Here, however, the other evidence is not sufficient to make timing a factor. The alleged threat LaPato delivered to Plaintiff regarding a protected activity occurred in early February, before Plaintiff's actual EEOC complaint was filed. Under Plaintiff's theory, the threat was not acted on for two full months, until *after* the LOM incident. I find, however, that the LOM incident interrupted any causal inference which might have been drawn from the two-month period.

Plaintiff's claim that Defendant fabricated or misrepresented documents and offered shifting reasons for his firing is also unpersuasive. Plaintiff points to a letter from Defendant to the EEOC which he claims references a made-up document, misrepresents maintenance reports from DualTemp, and is evidence of shifting reasons for his termination. The letter does lay out a long history of alleged infractions by Plaintiff. However, whether this laundry list is accurate is largely irrelevant, because the letter very clearly states that LaPato decided to wait until Plaintiff returned to work to determine whether to fire him. Instead, the letter states that the "last straw" for firing Plaintiff was the LOM incident. This is wholly consistent with the fact that CSCG took no action against Plaintiff for two months, then fired him nine days after the LOM incident.

In summary, Plaintiff has simply not offered sufficient evidence, as a matter of law, to establish that Defendant's proffered reason for firing him was pretext. In reaching this conclusion, I have viewed the evidence as a whole and in the light most favorable to Plaintiff. *Hobgood*, 731 F.3d at 643. Even so, under the "but-for" causation standard no reasonable jury could find that Plaintiff was the victim of unlawful retaliation. I therefore grant Defendant's motion for summary judgment on the Title VII claim.

## II. Illinois Workers' Compensation Retaliation Claim

This court may decline to exercise supplemental jurisdiction over a state law claim if all claims granting original jurisdiction in this court have been dismissed. 28 U.S.C. § 1367(c)(3) (2012). With the Title VII claim dismissed, no federal claims remain, and the "principle of comity encourages federal courts to relinquish supplemental jurisdiction pursuant to § 1367(c)(3)." *Hansen v. Bd. of Trustees of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 607 (7th Cir. 2008).

Considerations for dismissal include "judicial economy, convenience, and fairness to litigants." *Id.* (*quoting United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966)). In this case, there will be little loss of economy by trying the case in state court, and the parties will be better served litigating their state claim in a court which more frequently interprets the law of Illinois. I therefore follow the principle of comity and the "usual practice" of this circuit, *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999), and dismiss Plaintiff's state law claim without prejudice.

## CONCLUSION

For the reasons stated above, I am granting Defendant's motion for summary judgment on the Title VII claim and *sua sponte* dismissing the state law claim without prejudice.

ENTER:

James B. Zagel
United States District Judge

DATE: December 16, 2015

12